UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

WILLIAM HALE,

                    Plaintiff,

v.                                        Case No. 3:05-cv-565-J-32HTS

WALTER A. MCNEIL,[1]
etc.;

                    Defendant.
_____

## ORDER

## I. Status

On June 20, 2005, Plaintiff Hale, an inmate of the Florida penal system proceeding *pro se* and *in forma pauperis*, initiated this action by filing a Civil Rights Complaint Form (Doc. #1) (hereinafter Complaint) pursuant to 42 U.S.C. § 1983. Additionally, Plaintiff filed an Appendix of Exhibits (Doc. #3) in support of his Complaint.  On January 20, 2006, Plaintiff filed an Amended Complaint (Doc. #19), naming the following individuals as

---

[1] Walter A. McNeil, the current Secretary of the Florida Department of Corrections, is substituted as the proper party Defendant for James R. McDonough, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

the Defendants: James R. McDonough[2], the Secretary of the Florida Department of Corrections; L.E. Griffis; D. Robinson; Garrett Heishman; Jeffrey Wainwright; Barry V. Reddish; Stephen Brunt; Joseph Thompson; Lieutenant Starling; R. Polk; Virgil Locke; Dawn Mallard; Jackie Adams; Orlester Dickens; and Charles Shockley.  In the Amended Complaint, Plaintiff challenged his retention in close management (hereinafter CM) level one status at Florida State Prison (hereinafter FSP), claimed that the Defendants conspired to retain him on level one status in retaliation for his filing grievances and stated that his retention on level one status violated his Eighth Amendment right to be free from cruel and unusual punishment.

On September 18, 2007, this Court partially granted the Motion to Dismiss (Doc. #49), filed by Defendants McDonough, Heishman, Dickens, Adams, Shockley, Locke, Brunt, Polk, Reddish, Mallard, Griffis, Starling, Thompson and Wainwright, and the Motion to Dismiss (Doc. #83), filed by Defendant Robinson, to the extent that (1) Plaintiff's claims against Defendants Dickens, Adams, Shockley, Brunt and Polk for denying his grievances were dismissed; (2) Plaintiff's claims for compensatory and punitive damages for mental or emotional injury against Defendants Griffis, Robinson, Heishman,

---

[2] James R. McDonough was substituted as the proper party Defendant for James V. Crosby, Jr., pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.  See Court's Order (Doc. #25), filed May 16, 2006.

- 2 -

Wainwright, Reddish, Brunt, Thompson, Starling, Polk, Locke, Mallard, Adams, Dickens and Shockley were found to be barred by § 1997e(e) as long as Plaintiff remains incarcerated, and therefore the claims against Defendants Griffis, Robinson, Heishman, Wainwright, Reddish, Brunt, Thompson, Starling, Polk, Locke, Mallard, Adams, Dickens and Shockley were dismissed without prejudice; and (3) Plaintiff's conspiracy claims against Defendants Griffis, Robinson, Heishman, Wainwright, Reddish, Brunt, Thompson, Starling, Polk, Locke, Mallard, Adams, Dickens and Shockley were dismissed without prejudice. See Court's Order (Doc. #84), filed September 18, 2007, at 23-24. Further, this Court dismissed Defendants Griffis, Robinson, Heishman, Wainwright, Reddish, Brunt, Thompson, Starling, Polk, Locke, Mallard, Adams, Dickens and Shockley from the action. Id. at 24.

In that same Order, the Court ordered Plaintiff to file a Second Amended Complaint in accordance with the instructions contained in the Order, noting that "Plaintiff's claim may be against Defendant McDonough only, and he may only request injunctive relief." Id. Specifically, the Court instructed Plaintiff as follows:

> In the Amended Complaint, Plaintiff has not set forth allegations and/or claims concerning Defendant McDonough; however, he included him as a Defendant for the purpose of seeking injunctive relief.
>
> For this reason, this Court will allow Plaintiff an opportunity to amend his

complaint to articulate his claim against
Defendant McDonough.  In amending, Plaintiff
should set forth facts in support of his claim
against Defendant McDonough and should
describe how Defendant McDonough allegedly
violated his federal constitutional rights
while he was incarcerated at Florida State
Prison at the time of his second and third CM
reviews (August 14, 2003, and February 26,
2004).  Finally, Plaintiff should clarify the
injunctive relief he requests from Defendant
McDonough: whether it is for the promulgation
of new CM rules or whether it is injunctive
relief to specifically provide Plaintiff with
review of his current CM status.  Plaintiff
must also allege the constitutional or other
legal basis for any claim for injunctive
relief.

Id. at 22-23 (footnote omitted).

On December 26, 2007, this Court denied Plaintiff's motion for
rehearing and granted Plaintiff additional time to file the Second
Amended Complaint, again instructing Plaintiff that "Plaintiff's
claim may be against Defendant McDonough only, and he may only
request injunctive relief."  See Court's Order (Doc. #93).  On
February 21, 2008, Plaintiff Hale filed a Second Amended Civil
Rights Complaint Form (hereinafter Second Amended Complaint) (Doc.
#95), in which he names, as the Defendant, James McDonough in his
official capacity as the Secretary of the Florida Department
Corrections.  As reflected in the style of the case, Walter A.
McNeil, the current Secretary of the Florida Department of
Corrections, has been substituted as the proper party Defendant for
James McDonough, pursuant to Rule 25(d)(1) of the Federal Rules of
Civil Procedure.

- 4 -

Before the Court is Defendant McNeil's Response to Plaintiff's Second Amended Complaint, construed by this Court as a Motion for Summary Judgment.[3]  <u>See</u> Defendant's Response to Plaintiff's Second Amended Complaint (hereinafter Motion for Summary Judgment) (Doc. #99), filed May 12, 2008; Court's Order (Doc. #101), filed June 2, 2008.  Since Plaintiff is appearing *pro se*, the Court previously advised him of the provisions of Fed. R. Civ. P. 56 and gave him an opportunity to respond.  <u>See</u> Court's Order (Doc. #101) at 1, paragraph 1; Order of Special Appointment; Service of Process Upon Defendants; Notice to Plaintiff (Doc. #26) (setting forth the provisions of Rule 56 of the Federal Rules of Civil Procedure), filed May 23, 2006, at 5-6.  This Court granted Plaintiff additional time to respond, and Plaintiff filed Plaintiff's Reply to Defendant's Response to Plaintiff's Second Amended Complaint (Doc. #103) (hereinafter Plaintiff's Reply).  Thus, the Motion for Summary Judgment is now ripe for review.

## II.  Summary Judgment Standard

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  <u>Crawford v. Carroll</u>, 529 F.3d

---

[3] Defendant's exhibits, attached to the Motion for Summary Judgment (Doc. #99), will be hereinafter referred to as "Defendant's Ex."

961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and <u>Wilson</u> <u>v. B/E/Aerospace, Inc.</u>, 376 F.3d 1079, 1085 (11th Cir. 2004)).

The parties' respective burdens and the Court's responsibilities are outlined as follows:

> The movant bears the responsibility for demonstrating the basis for the summary judgment motion. [<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).] A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude grant of summary judgment. <u>Anderson</u>, 477 U.S. at 247-48, 106 S.Ct. 2505 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (citing <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. <u>Hickson Corp. v. N. Crossarm Co., Inc.</u>, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing <u>Anderson</u>, 477 U.S. at 248, 106 S.Ct. 2505).

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." <u>Jeffery v. Sarasota White Sox, Inc.</u>, 64 F.3d 590, 593-94 (11th Cir. 1995) (citing <u>Celotex</u>, 477 U.S. at 324, 106 S.Ct. 2548). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be

- 6 -

drawn in the non-moving party's favor. <u>Shotz v. City of Plantation, Fla.</u>, 344 F.3d 1161, 1164 (11th Cir. 2003).

<u>Allen v. Bd. of Pub. Educ. for Bibb County</u>, 495 F.3d 1306, 1313-14 (11th Cir. 2007).

"It is true that on a motion for summary judgment, all reasonable inferences must be made in favor of the non-moving party." <u>Cuesta v. School Bd. of Miami-Dade County</u>, 285 F.3d 962, 970 (11th Cir. 2002) (citation omitted). "A court need not permit a case to go to a jury, however, when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" <u>Id</u>. (citations omitted).

The United States Supreme Court has explained how to determine whether there is a genuine issue for trial.

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Industrial Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-248, 106 S.Ct. 2505,

> 91 L.Ed.2d 202 (1986).  When opposing parties
> tell two different stories, one of which is
> blatantly contradicted by the record, so that
> no reasonable jury could believe it, a court
> should not adopt that version of the facts for
> purposes of ruling on a motion for summary
> judgment.

Scott v. Harris, 127 S.Ct. 1769, 1776 (2007).

### III. Plaintiff's Allegations

In the Second Amended Complaint, Plaintiff Hale names the Secretary (Walter A. McNeil) of the Florida Department of Corrections (hereinafter DOC) only in his official capacity. Second Amended Complaint at 8.  Plaintiff explains that the Defendant "did not personally injure" Plaintiff, but rather is sued only for injunctive relief as "the final decision maker" for the DOC.  Id.  Specifically, Plaintiff claims that the DOC's policies and procedures, or the lack thereof, injured him at his second and third CM reviews while at FSP and again at his most recent CM review at Charlotte Correctional Institution.[4]  Id. at 8-9.  He asserts that, while at FSP, he unjustly spent over a year in CM level one status, the most restrictive level of CM, due to the DOC's policies and procedures or the lack thereof.  Id. at 9. Further, he notes that he will spend at least an unwarranted six

---

[4] As previously noted, this Court ordered Plaintiff to file a Second Amended Complaint, describing "how Defendant McDonough allegedly violated his federal constitutional rights while he was incarcerated at Florida State Prison at the time of his second and third CM reviews (August 14, 2003, and February 26, 2004)." Court's Order (Doc. #84), filed September 18, 2007, at 22-23.

months in CM level two status, the moderate level of CM.  Id.  As relief, he seeks injunctive relief enjoining the DOC from retaliating against grievance writers and denying due process and "substantive procedural protections" by using notations on contact cards or 229A sheets and by using past disciplinary reports as means for retention in CM.  Id. at 9-9b.

In challenging his retention in CM level one status, Plaintiff claims that at the time of his second review (August 14, 2003) by the three-member institutional classification team (including B.V. Reddish and L.E. Griffis), he was disciplinary-free for over one year, and his behavioral risk assessment score was twenty-one (21) (although he argues it should have been sixteen (16)).  Id. at 9c-9d.  With either a score of sixteen or twenty-one, he was in the moderate range, which demonstrated that he should have been progressed to CM level two status.  Id. at 9d.

Specifically, Plaintiff claims that D. Robinson (his classification officer and the subject of Plaintiff's grievances) prepared a flawed behavioral risk assessment and recommendation in retaliation for Plaintiff's filing of grievances.  Second Amended Complaint at 9c; Plaintiff's Second Amended Appendix of Exhibits (Doc. #95), filed February 21, 2008, Exhibit D (hereinafter Plaintiff's Ex.).  In arguing that Classification Officer Robinson should have scored him at sixteen points rather than twenty-one points, Plaintiff explains that (1) a disciplinary report he

received prior to his placement in CM was overturned, and therefore section E of his behavioral risk assessment (Plaintiff's Ex. D) should have been scored as a one, not a two; that section would then total two, not four, and (2) since the weapon that Plaintiff is alleged to have possessed was found more than a year prior, section F should have been scored as a one, not a two; that section would then total three, not six. Plaintiff's Second Amended Complaint at 9c. Thus, taking those points away, Plaintiff would have scored sixteen points rather than the twenty-one points that Defendant Robinson incorrectly assessed. Id. at 9c-9d. Thus, he notes that the score of sixteen is only two points above the behavior risk assessment's mild range. Id. at 9d. Additionally, Plaintiff claims that the three-member institutional classification team (including Reddish and Griffis) conspired to retaliate against Plaintiff (by keeping him in CM level one status) for his filing of grievances. Id. at 9c-9d. Plaintiff notes that there was "no viable reason" for his retention in CM level one, but that he should have progressed to CM level two. Id. at 9d.

Plaintiff also challenges his retention in CM level one status after the third review (February 26, 2004)[5] by the institutional classification team. Id. He claims that, at the time of the

_____

[5] While Plaintiff's Second Amended Complaint reflects that the third review was conducted on February 24, 2004, the Report of Close Management, submitted as Plaintiff's Ex. B, states that the review was on February 26, 2004.

hearing, he was disciplinary-free for eighteen months and his behavioral risk assessment score was an eight; however, Plaintiff was again retained in CM level one status.  Id.  Officer Heishman (Plaintiff's classification officer at that time), in recommending that Plaintiff be retained in CM level one status, cited to the disciplinary report that had been overturned almost a year earlier. Id. at 9d-9e.  The three-member institutional classification team (Reddish, Thompson and Starling) conspired to keep him in CM level one status due to the grievances he had filed.  Id. at 9e.  The team concluded that Plaintiff's poor disciplinary history, Plaintiff's poor attitude and notations on his contact card warranted further review and retention in CM level one status.  Id. at 9e; Plaintiff's Ex. B.  Plaintiff alleges that Thompson told Plaintiff that the team would do him a "favor" and give him a ninety-day review.  Plaintiff's Second Amended Complaint at 9e. However, when Plaintiff told him he was not doing him a favor, but merely wished to retaliate against him, Thompson told Reddish to "cross off" where he had noted that Plaintiff needed a ninety-day review.  Id.

As relief, Plaintiff Hale requests injunctive relief against the Secretary of the DOC to (a) promulgate rules and implement specific criteria for the progression of inmates through CM, taking into consideration the nature of the charge(s) that warranted placement in CM similar to the process provided for disciplinary

violations; (b) promulgate and implement a rule disallowing the use of disciplinary reports received prior to the placement in CM as a means for retention in CM since they are already factored into the behavioral risk assessment score; and (c) promulgate and implement a rule disallowing the use of notations on contact cards (DC6-229A form) as a means for retention in CM or promulgate and implement due process procedures for the contact cards.  Id. at 9f-9i.

### IV. Law and Conclusions

Plaintiff Hale claims that it is his retention in CM level one status twice at FSP and in CM level two once at Charlotte Correctional Institution that are at issue in this case. Plaintiff's Reply at 3.  The following facts are relevant for resolution of those issues.[6] Plaintiff Hale is a prisoner incarcerated by the DOC, and  Defendant McNeil is the current Secretary of the DOC. On July 30, 2002, Plaintiff was recommended for assignment to CM status.  Defendant's Ex. A, Report of Close Management.   The CM recommendation contained the following comments:

> Inmate Hale, William DC # 097437 was received from Tomoka C.I. for Internal Security Threat. Subject was transferred due to trying to manipulate staff against staff.  Since subject's receipt at Washington C.I.[,] he has received (11) Disciplinary Reports.  These

_____

[6] Plaintiff Hale states that he "accepts" Defendant's statement of the case and facts contained within the Motion for Summary Judgment (Doc. #99) at pages one through three. Plaintiff's Reply at 2.

> reports included (1) for 2-4: Fighting; (1)
> for 6-1: Disobeying an Order; (2) for 6-2:
> Disobeying Regulations; (5) for 9-17:
> Disorderly Conduct, three of those inmate
> received while in confinement; and (2) for 1-
> 3: Spoken Threats, in which inmate threatened
> to assault one officer in one incident and in
> another threatened to "put a piece of steel
> through the officer."   Based on subjects'
> [sic] continued attempts to manipulate staff
> against staff and his continued disruptive
> behavior consistent with Chapter 33-
> 601.800(2)(b)(2)(f),[7] it is recommended that
> Inmate Hale be assigned to Close management
> status pending further observation.

Id.  On August 2, 2002, Plaintiff was notified that he would
receive a review by the institutional classification team.   Id.
The three-member institutional classification team[8] (R.P. Tifit,
Tommy Pepper and Richard Johnson) held a hearing (at which
Plaintiff was present) to consider Plaintiff's assignment to CM
status.   Id.   The team approved the recommendation to assign

---

[7] Fla. Admin. Code Rule 33-601.800(2)(b)2.f. states that a
"pattern of behavior during the present period of incarceration
involving acts of violence or threats of violence" constitutes a
basis for placement of an inmate in CM level two status.
Defendant's Ex. G.

[8] The three-member institutional classification team,
consisting of the Warden or the Assistant Warden, Classification
Supervisor and the Chief of Security, is responsible for making
work, program, housing and inmate status decisions at the facility
and for making other recommendations to the State Classification
Office. Fla. Admin. Code Rule 33-601.800(1)(k); Defendant's Ex. G.

Plaintiff to CM status and recommended CM level one status,[9] stating:

> Inmate present during hearing.  Mental health assessment received and reviewed.  The team recommends assignment to CMI status due to a pattern of threats and violent behavior and currently pending disciplinary report for possession of a weapon while housed in confinement.  This record is consistent with 33-601.800(2)(a)(2)(j).[10]

Id.  On August 8, 2002, the State Classification Office approved the team's decision.[11]  Id.

On October 25, 2002, Plaintiff Hale was transferred to FSP and was placed in CM level one status, the most restrictive of the three levels.  Defendant's Ex. B, Report of Close Management.  On January 21, 2003, Plaintiff received a six-month review of his

---

[9] CM level one status is the most restrictive single cell housing level of all the CM management status designations, and an inmate assigned to CM level one status will be ineligible for a work assignment.  Fla. Admin. Code Rule 33-601.800(2)(a)1. and 2; Defendant's Ex. G.  CM level two status is restrictive cell housing which may or may not be restricted to single cell housing.  Fla. Admin. Code Rule 33-601.800(2)(b); Defendants' Ex. G.  And, CM level three status is the least restrictive cell housing unit in CM.  Fla. Admin. Code Rule 33-601.800(2)(c); Defendant's Ex. G.

[10] Fla. Admin. Code Rule 33-601.800(2)(a)2.j. states that "possession of weapons" constitutes a basis for placement of an inmate in CM level one status.  Defendant's Ex. G.

[11] The State Classification Office is a staff member at the central office level who is responsible for the review of inmate classification decisions and whose duties include approving, rejecting or modifying the institutional classification team's recommendations.  Fla. Admin. Code Rule 33-601.800(1)(q); Defendant's Ex. A, B, C, D; Report of Close Management, Form DC6-233C, Section IV, entitled SCO Review; Defendant's Ex. G.

- 14 -

initial August 8, 2002, assignment to CM status.  <u>Id</u>.  The CM

recommendation contained the following comments:

> <u>MED</u>: 2  <u>PSY</u>: 3  <u>RSLD</u>: 2023  <u>ESCAPES</u>:  No
> <u>TRANSFERRED  TO  F.S.P.</u>:  On  10/25/02  from
> S.F.R.C. for CM.  <u>CURRENT CM ASSIGNMENT</u>: CMI
> based on 10 DRs he received in 2002 including
> Spoken Threats (to assault staff) on 3/13/02,
> (to stab an officer) on 7/26/02 and Poss. of
> Weapons  (a  toothbrush  with  2  razors  melted
> into the end of it) on 7/31/02.  <u>PRESENT CM
> STATUS</u>:  CMI.   No  DR  this  review  period.
> <u>RECOMMENDATION</u>: Remain on CMI based on his
> Poor  DR  Record  to  include  threats  towards
> staff and Possession of Weapons.

<u>Id</u>.  On January 23, 2003, Plaintiff received notice that he would

be reviewed by the institutional classification team regarding his

CM status and was also informed that he would be permitted to

submit information to the team verbally or in writing regarding the

status of his assignment to CM.  <u>Id</u>.  On February 13, 2003, the

institutional  classification  team  held  a  hearing  to  review

Plaintiff's status in CM, and Plaintiff was present at the hearing.

<u>Id</u>.  The team recommended that Plaintiff continue in CM level one

status and made the following findings:

> Inmate  present  -  The  ICT  concurs  with  the
> recommendation  in  section  I.   His  poor  DR
> record warrants further review in CM.  His BRA
> [(behavioral  risk  assessment)]  dated  2-4-03
> and his memo dated 1-17-03 were reviewed.

<u>Id</u>.   The  State  Classification  Office  approved  the  team's

recommendation, stating:

> The  seriousness  of  the  disciplinary  reports
> originally placing Hale in CM warrants further
> observation  in  his  present  management  level.

> The Behavioral Risk Assessment, DC4-729[12],
> dated 2-4-03 and the Mental Health Status of
> Confinement inmate memo, DC4-528,[13] dated 1-
> 17-03 were considered.

Id.

Plaintiff Hale challenges his retention in CM level one status as a result of the institutional classification team's second review conducted on August 14, 2003. Plaintiff does not challenge his retention in CM level one status after his first review by the institutional classification team in February 2003. In May 2003, Plaintiff started to write numerous grievances concerning gain time and the conditions of his confinement. Plaintiff claims that, as a result of his writing those grievances, his classification officers and the institutional classification team members retaliated against him by keeping him in CM level one status. Thus, Plaintiff only challenges his retention in CM level one status after his second and third reviews by the institutional classification teams at FSP. Second Amended Complaint at 9c-9e.

On August 1, 2003, Officer Robinson (Plaintiff's classification officer at that time) made the following comments and recommendation:

_____

[12] The Florida Department of Corrections Office of Health Services Behavioral Risk Assessment form is labeled a DC4-729 form. See Plaintiff's Ex. D.

[13] The mental health staff completes the DC4-528 form, entitled "Mental Health Status of Confinement Inmates," as a means of notifying the classification supervisor of each inmate's mental health condition.

> MED: 2  PSY: 2  RSLD: 2023  ESCAPES:  No
> TRANSFERRED TO F.S.P.: On 10/25/02 from
> S.F.R.C. for CM.  CURRENT CM ASSIGNMENT: CMI
> based on 10 DRs he received in 2002 including
> Spoken Threats (to assault staff) on 3/13/02,
> (to stab an officer) on 7/26/02 and Poss. of
> Weapons (a toothbrush with 2 razors melted
> into the end of it) on 7/31/02.  PRESENT CM
> STATUS: CMI.   No DR this review period.
> RECOMMENDATION: Remain on CMI based on his DR
> History to include threats towards staff and
> Possession of Weapons.

Defendant's Ex. C, Report of Close Management.  Plaintiff received
notice that he would be reviewed by the institutional
classification team regarding his CM status and was also informed
that he would be permitted to submit information to the team
verbally or in writing regarding the status of his assignment to
CM.  Id.  On August 14, 2003, the three-member institutional
classification team (J.D. Wainwright, B.V. Reddish and L.E.
Griffis) held a hearing, at which Plaintiff was present, to review
Plaintiff's CM level one status.  Id.  The team recommended that
Plaintiff continue in CM level one status and made the following
findings:

> Inmate present - The ICT concurs.  His poor DR
> record warrants further review in CMI.
>
> His BRA [(behavioral risk assessment)] dated
> 6-9-03 and his memos dated 7-9-03 were
> reviewed.

Id.  The State Classification Office approved the team's
recommendation, stating:

> BRA (DC4-729) results of 06/09/03 and his
> mental health assessment of 07/09/03 were
> reviewed and considered.

Id.

Plaintiff also challenges his retention in CM level one status as a result of the institutional classification team's third review conducted on February 26, 2004. On January 30, 2004, Officer Heishman (Plaintiff's classification officer at that time) made the following comments and recommendation:

> MED: 2 PSY: 3 RSLD: 2023 ESCAPES: No
> TRANSFERRED TO F.S.P.: On 10/25/02 from
> S.F.R.C. for CM. CURRENT CM ASSIGNMENT: CMI
> based on 10 DRs he received in 2002 including
> Spoken Threats (to assault staff) on 3/13/02,
> (to stab an officer) on 7/26/02 and Poss. of
> Weapons (a toothbrush with 2 razors melted
> into the end of it) on 7/31/02. PRESENT CM
> STATUS: CMI.   No DR this review period.
> RECOMMENDATION: Remain on CMI based on his DR
> History to include threats towards staff and
> Possession of Weapons.

Defendant's Ex. D, Report of Close Management. Plaintiff received notice that he would be reviewed by the institutional classification team regarding his CM status and was also informed that he would be permitted to submit information to the team verbally or in writing regarding the status of his assignment to CM.  Id.  On February 26, 2004, the three-member institutional classification team (B.V. Reddish, Joseph Thompson and Lonnie Starling) conducted a hearing, at which Plaintiff was present, to review Plaintiff's CM level one status.  Id.  The team recommended

that Plaintiff continue in CM level one status and made the
following findings:

> Inmate present - The ICT concurs.  His poor DR
> history and neg. notations on his contact card
> warrants further review in CMI.  The subject
> displayed a poor attitude towards the ICT.[14]
> His BRA [(behavioral risk assessment)] dated
> 2-16-04 and his memos dated 10-7-03, 11-4-03,
> 12-23-03, 1-21-04, and 2-25-04 were reviewed.

Id.

The  State  Classification  Office  approved  the  team's
recommendation, stating:

> BRA dated 2-16-04 and DC4-528's dated 10-7-03,
> 11-4-03, 12-23-03 and 1-21-04, [and] 2-25-04
> [were] reviewed and considered.

Id.

In June of 2005, Plaintiff Hale was released from CM status.
Defendant's Ex. E.  On July 11, 2007, Plaintiff was assigned to CM
level  two  status  while  at  Jefferson  Correctional  Institution.
Defendant's Ex. F, Report of Close Management.  The initial
referral reason was that he had exhibited a pattern of behavior
during  the  present  period  of  incarceration  involving  acts  of

---

[14] In the Second Amended Complaint, Plaintiff stated that
Joseph Thompson, a team member, offered him a ninety-day review,
stating it was "a favor."  Second Amended Complaint at 9e.  When
Plaintiff told Thompson that he was not doing him a favor, but was
retaliating  against  him  and  illegally  using  229A  notations  to
retain him in CM status, Thompson told Reddish to cross out the
ninety-day  review  recommendation.  Id.  The  Report  of  Close
Management reflects that the team's recommendation of a ninety-day
review was crossed out and that the team noted that Plaintiff Hale
had "displayed a poor attitude towards the ICT."  Defendant's Ex.
D.

violence or threats of violence.  Id.  On January 4, 2008, it was recommended that he remain in CM level two status with the stated basis as follows:

> Inmate is currently in C2 and based on seriousness of original placement reason and/or inmate's poor adjustment[,] safety and security concerns exist which warrant continuation of C2.
>
> . . . .
>
> Inmate Hale was initially assigned to CM2 at Jefferson CI on 7/11/07 based on threats of violence.  He transferred to CHACI'S [(Charlotte Correctional Institution)] TCU [(Transitional Care Unit)] 8/27/07 where he remains.  Since the initial assessment, he has received one additional DR on 11/14/07 for possession of contraband, had three unsatisfactory security gain time ratings for August, September, and November, and received all above satisfactory mental health gain time ratings.  Review of the database reveals no detainers or convictions for assaults on staff.  Recommend continued CM2 assignment based on less than satisfactory adjustment.

Id.

Plaintiff received notice that he would be reviewed by the institutional classification team regarding his CM status and was also informed that he would be permitted to submit information to the team verbally or in writing regarding the status of his assignment to CM.  Id.  On January 30, 2008, the three-member institutional classification team (S. Porter, Steve Roddenberry and L. Severson) conducted a hearing, at which Plaintiff was present, to review Plaintiff's CM level two status.  Id.  The team

- 20 -

recommended that Plaintiff continue in CM level two status and noted that the basis for the recommendation was that Plaintiff Hale had received the November 14, 2007, disciplinary report for possession of contraband and three unsatisfactory ratings during August, September and November.  Id.  The team had reviewed and considered the November 14, 2007, behavioral risk assessment (Form DC4-729) and the January 30, 2008, Mental Health Status of Confinement Inmates at CSU/TCU/CMHI (Form DC4-528).[15]

The State Classification Office approved the team's recommendation that Plaintiff remain in CM level two status, stating that the following assessments were reviewed and considered:  the November 14, 2007, behavioral risk assessment (Form DC4-729) and the January 30, 2008, Mental Health Status of Confinement Inmates (Form DC4-528).

In order to obtain permanent injunctive relief, Plaintiff must show "(1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right;[16] and (3)

_____

[15] The mental health staff completes the DC4-528 form, entitled "Mental Health Status of Confinement Inmates," to notify the classification supervisor of each inmate's mental health condition. And, CSU is the crisis stabilization unit; TCU is the transitional care unit; and CMHI is the corrections mental health institution. See http://www.dc.state.fl.us/business/contracts/S4055.pdf.

[16] As previously noted, Plaintiff's claims for compensatory and punitive damages for mental or emotional injury against Defendants Griffis, Robinson, Heishman, Wainwright, Reddish, Brunt, Thompson, Starling, Polk, Locke, Mallard, Adams, Dickens and Shockley were

irreparable harm will result if the Court does not order injunctive relief." <u>Edmonds v. Levine</u>, 417 F.Supp.2d 1323, 1334 (S.D. Fla. 2006).  In sum, since injunctive relief is an extraordinary remedy, not only must you have an infringement of a legal right, but that infringement must be by "an injury for which there is no adequate legal remedy and which will result in irreparable injury if the injunction does not issue." <u>Alabama v. U.S. Army Corps of Eng'rs</u>, 424 F.3d 1117, 1127 (11th Cir. 2005) (citations omitted), <u>cert</u>. <u>denied</u>, 547 U.S. 1192 (2006).  For the reasons hereinafter stated, Plaintiff is not entitled to the injunctive relief he now seeks.

CM is "[t]he confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusing the rights and privileges of others." Fla. Admin. Code Rule 33-601.800(1)(d); Defendant's Ex. G.  CM is a housing assignment based on the security concerns of the prison, and it is not a punitive measure as is disciplinary confinement. Placement in CM is based on the prison officials' belief that an inmate requires the enhanced security and supervision inherent in CM status.

---

found to be barred by 42 U.S.C. § 1997e(e) as long as Plaintiff remains incarcerated and were dismissed without prejudice.  His conspiracy claim against those Defendants was also dismissed without prejudice.

In instituting security practices such as CM, prison administrators "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979) (citations omitted). Judgments regarding security and the penological interests "are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Lawson v. Singletary, 85 F.3d 502, 510-11 (1996) (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)). "Such deference is especially appropriate with respect to the primary state interest involved in this case -- the maintenance of peace and security within the prison facility." Id. at 510 (quoting Pell, 417 U.S. at 823 ("Central to all other corrections goals is the institutional consideration of the internal security within the corrections facilities.")). "Such deference is justified because of 'the complexity of prison management, the fact that responsibility therefor is necessarily vested in prison officials, and the fact that courts are ill-equipped to deal with such problems.'" Al-Amin v. Smith, 511 F.3d 1317, 1328 (11th Cir. 2008) (citation omitted). "This deference does not mean, however, that

courts must abstain from reviewing the constitutional claims of prisoners." <u>Sheley v. Dugger</u>, 833 F.2d 1420, 1423 (11th Cir. 1987).

Assignment of an inmate to CM status is based on the prison officials' professional judgment about the security risks that a particular inmate poses to the internal prison environment. Here, the prison officials determined that Plaintiff Hale's behavior justified his placement in CM status where he would receive enhanced supervision and security.

> When an inmate in general population has committed acts that threaten the safety of others, threaten the security of the institution, or demonstrate an inability to live in the general population without abusing the rights and privileges of others, the inmate shall be placed in administrative confinement pending close management review.

Fla. Admin. Code Rule 33-601.800(3)(b); Defendant's Ex. G.

As previously noted, Plaintiff Hale does not challenge his assignment and placement in CM status, but rather challenges his retention in CM level one status as a result of the second review on August 14, 2003, and the third review on February 26, 2004, at FSP and his retention in CM level two status at Charlotte Correctional Institution as a result of the January 30, 2008, review. Second Amended Complaint at 9; Plaintiff's Reply at 3. Plaintiff claims that, through his continued confinement in CM status, he has been denied due process and procedural protections. Second Amended Complaint at 9.

- 24 -

> While no State may "deprive any person of
> life, liberty, or property, without due
> process of law," it is well-settled that only
> a limited range of interests fall within this
> provision.  Liberty interests protected by the
> Fourteenth Amendment may arise from two
> sources - the Due Process Clause itself and
> the laws of the States.

Hewitt v. Helms, 459 U.S. 460, 466 (1983) (citing Meachum v. Fano, 427 U.S. 215, 223-27 (1976)).

In Sheley v. Dugger, the Eleventh Circuit reviewed Sheley's claim that his continued confinement[17] in CM deprived him of liberty without affording him procedural due process because his status was not periodically reviewed and because he was not given an opportunity to present his views to the prison officials charged with determining his status.  The court, citing the CM rules in effect at that time, stated:

> We find that the mandatory language and
> substantive predicates in the Department of
> Corrections' rules and regulations concerning
> administrative segregation and close
> management create for inmates a liberty
> interest in remaining in the general prison
> population.

Sheley, 833 F.2d at 1424.  The current rules for review of CM status provide that "[t]he purpose shall be toward reducing the inmate's status to the lowest management level or returning the inmate to general population as soon as the facts of the case

---

[17] Sheley's confinement in CM was lengthy (twelve years) and uninterrupted.  Sheley v. Dugger, 833 F.2d 1420, 1426, 1427 (11th Cir. 1987).

indicate that this can be done safely." Fla. Admin. Code Rule 33-601.800(16)(a); Defendant's Ex. G.  Further, the rules set forth the designated responsibilities of the inmate's classification officer, the classification supervisor, the institutional classification team and the State Classification Office for their review of the inmate's CM status.

    (c) When an inmate has not been released to general population and is in any close management status for six months, the classification officer shall interview the inmate and shall prepare a formal assessment and evaluation on the Report of Close Management [(Form DC6-233C)]. Such reports shall include a brief paragraph detailing the basis for confinement, what has transpired during the six month period, and whether the inmate should be released, maintained at the current level, or reduced to a lower level of management [(or modified to another level of management)[18]]. The case shall be forwarded to the classification supervisor who shall docket the case for ICT [(institutional classification team)] review.

    (d) The ICT shall review the report of close management prepared by the classification officer, consider the results of behavioral risk assessments and mental health evaluations and other information relevant to institutional adjustment, staff and inmate safety, and institutional security, and insert any other information regarding the inmate's status and interview the inmate. The ICT's recommendation shall be documented in OBIS (Offender Based Information System, the DOC's computer offender database system which is utilized to organize and store security, classification, program and other offender

---

[18] See Fla. Admin. Code Rule 33-601.800(16)(c) (2008); Defendant's Ex. G.

information)] and the Report of Close
Management, Form DC6-233C. If it is determined
that no justifiable safety and security issues
exists [sic] for the inmate to remain in close
management the ICT shall forward their
recommendation for release to the SCO for
review. For an inmate to remain in close
management the ICT shall justify the safety
and security issues or circumstances that can
only be met by maintaining the inmate at the
current level or a lower level of management
[(or modifying the inmate to another level of
management)[19]].

(e) The SCO shall conduct an onsite
interview with each inmate at least once every
six months or as often as necessary to
determine if continuation, modification, or
removal from close management status is
appropriate. The SCO shall review all reports
prepared by the ICT concerning an inmate's
close management status, consider the results
of behavioral risk assessments and mental
health evaluations and other information
relevant to institutional adjustment, staff
and inmate safety, and institutional security
and may interview the inmate before
determining the final disposition of the
inmate's close management status. If it is
determined that no justifiable safety and
security issues exist for the inmate to remain
in close management the SCO shall cause the
inmate to be immediately released. For an
inmate to remain in close management, the SCO
shall determine based on the reports and
documentation that there are safety and
security issues or circumstances for
maintaining the inmate at the current level or
at a lower level of management [(or at a
modified level of management)[20]]. The SCO's
decision shall be documented in OBIS and the

_____

[19] See Fla. Admin. Code Rule 33-601.800(16)(d) (2008);
Defendant's Ex. G.

[20] See Fla. Admin. Code Rule 33-601.800(16)(d) (2008);
Defendant's Ex. G.

>          Report of Close Management, Form DC6-233C.
>          The ICT shall advise the inmate of the SCO's
>          decision.

Fla. Admin. Code Rule 33-601.800(16) (2003); Defendant's Ex. G.

        However, in <u>Sandin v. Conner</u>, 515 U.S. 472, 481 (1995), the
United States Supreme Court concluded that the focus of the
liberty interest inquiry should be on the nature of the deprivation
rather than on the language of the state prison regulation.  The
Court stated that while States may under certain circumstances
create liberty interests which are protected by the Due Process
Clause, "these interests will be generally limited to freedom from
restraint which, while not exceeding the sentence in such an
unexpected manner as to give rise to protection by the Due Process
Clause of its own force . . . nonetheless imposes atypical and
significant hardship on the inmate in relation to the ordinary
incidents of prison life."  <u>Id</u>. at 483-84.  Thus, while not free
from all doubt,[21] the Court assumes that the unjustified retention
of Plaintiff in CM status would still implicate a liberty interest.

---

        [21] <u>See</u> <u>Magluta v. Wetzel</u>, No. 03-20155, 2006 WL 3837455, *6-7
(S.D. Fla. Dec. 29, 2006), <u>aff'd</u>, 253 Fed. Appx. 913 (11th Cir.
2007); <u>Chandler v. Haas</u>, No. 1:07-cv-145-MP-AK, 2008 WL 2096380, *1
(N.D. Fla. May 16, 2008) (recognizing that Plaintiff has no liberty
interest in being kept out of close management since the
segregation is not an "atypical and significant hardship . . . in
relation to ordinary incidents of prison life").

However, even assuming that Plaintiff has shown the factual predicate to support a deprivation of a liberty interest by the conditions of his confinement in CM status, he must also demonstrate that he was not afforded due process of the law. Magluta v. Wetzel, No. 03-20155, 2006 WL 3837455, *8 (S.D. Fla. Dec. 29, 2006), aff'd, 253 Fed. Appx. 913 (11th Cir. 2007). Thus, the second part of this Court's inquiry entails determining whether the process afforded to Plaintiff Hale satisfied the minimum requirements of the Due Process Clause. The United States Supreme Court has cautioned that "administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates." Hewitt v. Helms, 459 U.S. at 477 n. 9.

The record reflects that Plaintiff Hale was afforded due process in the review of his CM status and that he received timely, periodic reviews to ensure that his retention on CM status was justified. For each review, Plaintiff received notice of the upcoming CM review, stating: "You are hereby notified that you shall receive a review by the Institutional Classification Team no earlier than 48 hours from the time this notice is delivered. You are permitted to submit information to the Team verbally or in writing regarding the status of your assignment to Close Management." Defendant's Ex. C, D, F; Plaintiff's Ex. A, B, C.

Additionally, the institutional classification team conducted periodic and timely hearings to consider his continued retention in CM, and Plaintiff was present at those hearings. <u>Id</u>. Plaintiff, at each hearing, had an opportunity to present information to the team for their consideration regarding the recommendation to keep him in CM. <u>Id</u>.

Plaintiff now seeks to have rules promulgated and implemented establishing specific criteria for the progression of inmates through CM. Specifically, Plaintiff suggests that a rule be created that sets forth a designated time period that an inmate will be housed in CM based on the infractions that placed him there. Second Amended Complaint at 9f-9g. Lars Severson, who served as a member of the institutional classification team for Plaintiff's January 30, 2008, hearing at Charlotte Correctional Institution (<u>see</u> Defendant's Ex. F), provided an affidavit, describing the specific criteria used by the institutional classification team in making a recommendation to the State Classification Office.

> I am presently employed as a Correctional Probation Supervisor with the Department of Corrections at Charlotte Correctional Institution. I have been in this position since October 2007, and I have been employed with the Department of Corrections since 1993.
>
> In my position with the Department of Corrections, part of my job responsibilities is to supervise the classification department, which contains the files of inmates who are currently housed at Charlotte Correctional

Institution.  In addition, I serve as a member of the Institutional Classification Team (ICT).  The ICT is the team that consists of the warden or assistant warden, classification supervisor, a correctional chief, and other members as necessary when appointed by the warden or designated by rule.  The ICT is responsible for evaluating the recommendations for close management and review of inmates on close management, conducting close management hearings, interviews of close management inmates and consideration of information provided by inmates during close management hearings.  The ICT is also responsible for making work, program, housing and inmate status decisions at a correctional institution and for making other inmate recommendations to promote the security and good order of the institution.

The Department of Corrections' rules regarding close management establish a system of review of those inmates in close management to determine the need for continued placement in certain levels of close management or return [of] an inmate to general population.

Hearings are held regarding the initial recommendation for an inmate to be placed in close management and review hearings are held to determine an inmate's continued close management status or return to general population.  The inmate is afforded an opportunity to be at the hearing and make statements.

.  .  .  .

Form DC6-229A, Close Management Daily Record of Segregation[22], is a form that is

---

[22] Form DC6-229A is the Close Management Daily Record of Segregation, which is maintained for each inmate as long as he is in close management.  Fla. Admin. Code Rule 33-601.800(17)(b) (2008); Defendant's Ex. G.  The form is used to document any activities, including cell searches, items removed, showers, outdoor exercise, haircuts and shaves.  Id.  "The close management

> used to record, on a daily basis, information
> relevant to an inmate's behavior.    The
> Department rules allow for this form to be
> utilized while an inmate is in close
> management.  This form is used to assist staff
> in assessing an inmate's progress in close
> management.

Defendant's Ex. H, Affidavit of Lars Severson (hereinafter

Severson's Affidavit).

The DOC's rules provide specific criteria for the progression

of inmates through CM.  <u>See</u> Defendant's Ex. G.  Specifically, the

institutional classification team is required to review the Report

of Close Management prepared by the classification officer and

consider the results of behavioral risk assessments and mental

health evaluations and any other information relevant to

institutional adjustment, staff and inmate safety, and

institutional security.  And, the State Classification Office is

required to review all reports prepared by the team concerning the

inmate's CM status as well as consider the results of behavioral

risk assessments and mental health evaluations and any other

information relevant to institutional adjustment, staff and inmate

safety, and institutional security.  For an inmate to remain in CM,

the final reviewer (the State Classification Office) must

determine, based upon the reports and documentation, that there are

safety and security issues or circumstances for keeping the inmate

---

unit officer shall make a notation of any unusual occurrences or
changes in the inmate's behavior and any action taken."   <u>Id</u>.

within CM.  Fla. Admin. Code Rule 33-601.800 (16)(e).  Plaintiff
has not shown that this detailed procedure violates his due process
rights.

Additionally, Plaintiff seeks to have a rule promulgated that
does not allow the use of disciplinary reports received prior to
the placement in CM as a means for retention in CM since they are
already factored into the behavioral risk assessment score.  Second
Amended Complaint at 9g.  Team member Severson has stated:

> When an inmate is reviewed for close
> management, the inmate's prior disciplinary
> report history is not determinative of whether
> an inmate remains in close management.  The
> ICT considers **other factors**[23] in making a
> determination to retain an inmate on close
> management or return to general population.
> The ICT is aware of the information provided
> in the Behavioral Risk Assessment (BRA) and
> takes into consideration that some categories
> of the BRA relate to acts that may have
> occurred in the past.

Severson's Affidavit (emphasis added).  While Plaintiff Hale's
disciplinary record was described as "poor" at both the second and
third reviews at FSP, it was also acknowledged that he did not have
any disciplinary reports for those review periods.  Defendant's Ex.
C, D; Plaintiff's Ex. A, B.  Moreover, he was released from CM

---

[23] Fla. Admin. Code Rule 33-601.800(16)(d) states that the
institutional classification team shall review the Report of Close
Management (Form DC6-233C) prepared by the classification officer,
shall consider the results of the behavioral risk assessments and
mental health evaluations and other information relevant to
institutional adjustment, staff and inmate safety, and
institutional security and insert any other information regarding
the inmate's status.  Defendant's Ex. G.

status in 2005 and remained outside of it for over two years before he was returned to CM level two status in 2007.  Additionally, in 2008, in recommending that he continue his CM level two status at Charlotte Correctional Institution, the classification officer noted that Plaintiff had received an additional disciplinary report during the review period (November 14, 2007, for possession of contraband).  Defendant's Ex. F; Plaintiff's Ex. C.  Thus, while the team and the State Classification Office reviewed the recommendations (which recognized his "poor" disciplinary record), as team member Severson noted, "other factors" were considered in deciding whether it was safe to return him to the general population.  Since the focus is upon Plaintiff's institutional adjustment, behavioral progress and mental stability during those specific review periods, they reviewed and considered the behavioral risk assessments (Form DC4-729), the Mental Health Status of Confinement Inmates (Form DC4-528) and the Close Management Daily Records of Segregation (Form DC6-229A).  Those documents reflected his behavioral adjustment for those particular review periods.  Defendant's Ex. C, D, F; Plaintiff's Ex. A, B, C.  Again, Plaintiff received all the process to which he was due.

Further, Plaintiff's double jeopardy argument (Second Amended Complaint at 9g) is unavailing.  The Double Jeopardy Clause provides three related protections:

> It protects against a second prosecution for
> the same offense after acquittal. It protects

- 34 -

> against a second prosecution for the same
> offense after conviction. And it protects
> against multiple punishments for the same
> offense.

North Carolina v. Pearce, 395 U.S. 711, 717 (1969); United States
v. Wilson, 420 U.S. 332, 343 (1975); Butler v. McDonough, No. 2:06-
cv-206-FtM-29SPC, 2007 WL 2071530, *8 (M.D. Fla. 2007) ("These
protections apply to criminal trials, not disciplinary hearings or
subsequent inmate classifications utilized by jail officials to
maintain safety and security at the jail."); Taylor v. Gomez, 182
F.3d 927 (9th Cir. 1999) (concluding that the inmate's double
jeopardy argument lacked merit in that the district court correctly
reasoned that his custody classification "is not punishment, but
rather a method for housing inmates based on their behavior").

    Plaintiff Hale also asserts that a rule should be promulgated
and implemented that would not allow the use of notations on the
DC6-229A form as a means for retention in CM or that due process
procedures should be implemented for the use of the contact cards.
Second Amended Complaint at 9, 9e, 9h-9i. The DOC's DC6-229A form
is the Close Management Daily Record of Segregation form, on which
information relevant to the inmate's behavior is recorded on a
daily basis. "The close management unit officer shall make a
notation of any unusual occurrences or changes in the inmate's
behavior and any action taken." Fla. Admin. Code Rule 33-
601.800(17)(b) (2008). According to team member Severson, the form
is used to assist the staff in assessing the inmate's progress in

CM.  See Severson's Affidavit.  Thus, since the classification officer, the classification supervisor, the institutional classification team and the State Classification Officer are concerned with whether the inmate still demonstrates an inability to live in the general population and thus are specifically focused upon "other information relevant to institutional adjustment, staff and inmate safety and institutional security," this form plays a relevant role in documenting an inmate's daily activities and behavior.  Fla. Admin. Code Rule 33-601.800(16)(c)-(e) and (17)(b); Defendant's Ex. G.

In sum, at Plaintiff's three CM periodic reviews (August 14, 2003; February 26, 2004; and January 30, 2008), he received the process that he was due for the review of his CM retention.  See Defendant's Ex. C, D, F; Plaintiff's Ex. A, B, C.  Defendant McNeil did not violate Plaintiff's federal constitutional rights, and Plaintiff is not entitled to injunctive relief.  Defendant's Motion for Summary Judgment will be granted, and judgment will be entered in favor of Defendant McNeil.

Therefore, it is now

**ORDERED AND ADJUDGED:**

1.  Defendant McNeil's Response to Plaintiff's Second Amended Complaint (Doc. #99), construed as a Motion for Summary Judgment, is **GRANTED.**

2.    The Clerk of Court shall enter judgment in favor of Defendant McNeil.

3.    The Clerk of Court shall close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 10th day of September, 2008.


TIMOTHY J. CORRIGAN
United States District Judge


sc 9/8
c:
William John Hale
Counsel of Record

- 37 -